CONSOLIDATED COMPANIES, Inc., v. ANGELLOZ et al.

No. 1519.

Court of Appeal of Louisiana. First Circuit.

March 23, 1936.

Dupont & Dupont, of Plaquemine, for appellants.

Borron, Owen & Borron, of Plaquemine, for appellee.

OTT, Judge.

The suit is to recover the sum of $1,858.-61, less a credit of $32.50, and is based on the following document signed by the three defendants, Howard Angelloz, D. D. Angelloz, and A. J. Angelloz, viz.:

"Grosse Tete, La.
"September 8th, 1931.
"The Consolidated Companies, Inc.,
Plaquemine, Louisiana.

"Dear Sirs:—In Re:—Account of A. A. Angelloz with yourselves.

"We hereby agree and bind ourselves to pay you six months after date any balance due you, if any, on the present account of A. A. Angelloz with the understanding that there will be no interest charge on same."

"Yours truly,
"[Signed]     D. D. Angelloz.
"A. J. Angelloz.
"Howard Angelloz."

On the date of this document, September 8, 1931, A. A. Angelloz, a brother of defendants who signed the document, was indebted to plaintiff for goods, wares, and merchandise in the sum of $1,858.61. It is alleged in the petition that the document was signed by defendants to secure said indebtedness, and that the consideration therefor was the agreement on the part of plaintiff that there would be no interest charged on the account of A. A. Angelloz, and plaintiff was not to execute on a judgment against this principal debtor for six months, which judgment was to be procured by plaintiff for the amount of the account.

Defendants admit signing the document, but aver that it was signed by them at the request of their brother, A. A. Angelloz, who stated to them that the plaintiff company, through its president, V. J. Kurzweg, was to effect a settlement with the unsecured creditors of said A. A. Angelloz, whereby he would be permitted to continue in business and pay on the account during the six months' period, and that, in order to secure any balance that might be due on the account at the end of the six months, plaintiff had requested that these brothers sign this letter of guaranty; that the president of plaintiff company was to effect the settlement with the unsecured creditors of said A. A. Angelloz on the basis of not over 25 cents on the dollar, and as a means of forcing said settlement the plaintiff was to secure a judgment on

its claim, which was the largest unsecured claim, and use this judgment in inducing the creditors to accept the proposed compromise settlement with the other creditors, but the claim of plaintiff was to be paid in full, and the principal debtor was to be in position to continue in business and avoid bankruptcy. It is further averred in the answer that said letter of guaranty was signed and delivered to said A. A. Angelloz merely as an offer to guarantee payment of the balance due on the debt of their brother after six months on condition that he would continue in business and would avoid bankruptcy, and on condition that the president of plaintiff company would effect the 25 per cent. settlement for their brother; that plaintiff never effected said settlement, nor have defendants ever been notified by plaintiff that it received, accepted, or acted on the said letter signed under the circumstances mentioned; that said letter was without consideration to them, or to their said brother. The district judge rendered judgment against defendants jointly for the amount sued for. The defendants appeal.

Testimony in support of the defense set up in the answer was objected to on the ground that it was an effort to vary and contradict the written document by parole evidence. The testimony was admitted and forms the greater part of the evidence in the record.

The evidence was admissible for two reasons: (1) To show the consideration moving to defendants in signing the alleged guaranty, and to disprove the allegation in the petition setting forth another and different consideration. Also for the purpose of determining whether the consideration was legal and sufficient to support the guaranty under the circumstances under which it was signed, "where the contract of guaranty does not import a consideration on its face, the burden is on plaintiff to prove the consideration, or, where a particular consideration is alleged, to prove such consideration." Corpus Juris, vol. 28, page 1026, par. 196, Verbo, "Guaranty." (2) To show the facts and circumstances under which defendants signed the alleged guaranty in order to determine whether or not it was necessary for plaintiff to notify defendants that it had received, accepted, and acted on said letter of guaranty. In the cases relied on by plaintiff in its contention that no no-

tice of acceptance was necessary in this case, it appears in those cases that evidence was admitted, without objection apparently, to show the facts and circumstances surrounding the signing, delivery, and manner of acting on the guaranties. Commercial National Bank v. Richardson, 163 La. 933, 113 So. 152; Hibernia Bank & Trust Co. v. Succession of Cancienne, 140 La. 969, 74 So. 267, L.R.A.1917D, 402; People's Bank of New Orleans v. Lemarie et al., 106 La. 429, 31 So. 138.

The testimony shows that the principal debtor, A. A. Angelloz, called on the president of plaintiff corporation on September 8, 1931, with the purpose of laying before the president the strained financial condition in which Angelloz found himself. These two went over the situation and came to the conclusion that the only way for Angelloz to avoid bankruptcy was to made a compromise settlement with his unsecured creditors on the basis of not over 25 per cent. of their claims. Plaintiff was one of the largest, if not the largest, ordinary creditor. The arrangements made by the president of plaintiff company and the debtor, Angelloz, for effecting the settlement with the creditors and in securing this letter of guaranty from the defendants will appear from a few extracts from the testimony of these two men.

In describing the arrangements agreed on by them, Mr. Kurzweg, the president of plaintiff corporation, says (tes. p. 20):

"We discussed the matter together with his attorney, Mr. Dupont, and concluded it would be best for us to file suit immediately and get a judgment, and that we would then attempt to get the creditors together and see if we could not work out some sort of compromise arrangement with all creditors. Before we went to the attorney's office, I told him that I felt he should see that we got all this money. I felt that the entire Angelloz family were interested in that business."

In pursuance of that agreement and on the same day the plaintiff filed suit against A. A. Angelloz for the amount of the claim and legal interest, and, in order to facilitate service on him, Angelloz remained in Plaquemine until the petition could be drawn and served on him. Notices were sent out for a meeting of the creditors to be held on October 3, 1931, a sufficient time being given to secure the judgment against Angelloz for use at this creditors' meeting. The letter of guaranty to secure plaintiff's claim was prepared and given to Angelloz to procure the signature of defendants thereon. No communication with reference to this letter of guaranty was had by plaintiff with defendants in any manner whatever, but A. A. Angelloz was invested with the duty of getting the letter signed. Just prior to the date fixed for the creditors' meeting, the letter not having been returned to plaintiff by A. A. Angelloz, plaintiff wrote a letter to A. A. Angelloz under date of September 28, 1931, stating that the letter which he was to have his relatives sign had not been returned and requesting that he attend to the matter at once. Shortly thereafter Angelloz delivered the letter to plaintiff signed by his three brothers. The judgment against A. A. Angelloz was rendered on October 1, 1931, two days before the creditors' meeting.

With reference to the purpose and manner of obtaining this letter on which the suit is based, Mr. Kurzweg says (tes. p. 35):

"Q. This letter was taken by Arthur Angelloz to Grosse Tete, and he was to speak to his brothers? Isn't that true?

"A. Yes.

"Q. Would you state whether or not he was to tell these brothers when he went to Grosse Tete that you wanted this letter signed whether he went in bankruptcy or not? Is that your understanding of it?

"A. No. I would not say that. I don't know what he was to tell them, except that he was to get them to sign the letter guaranteeing to pay us if he did not, in six months.

"Q. After this letter was signed, you went into a Creditors' meeting, just a little bit less than a month later, and urged a twenty per cent settlement?

"A. No. I did not urge; I told them I thought that was all they would get, that I thought that was all the assets justified their paying.

"Q. If these creditors had all accepted this twenty per cent proposition with Mr. Angelloz, was it your idea that you were to hold these people on that guaranty for the whole $1800, or for twenty per cent?

"A. No. I would have credited twenty per cent on the total, and they would have owed me the balance without interest for six months."

The testimony of this witness also shows how the creditors were to be influenced in accepting the compromise by the use of the judgment. We quote again (tes. p. 99 et seq.):

"By Mr. Dupont:

"Q. Mr. Kurzweg, at this creditors' meeting of course you mentioned to these creditors that you had obtained judgment against Arthur Angelloz?

"A. Yes.

"Q. And you told them you were one of the largest creditors of Arthur Angelloz?

"A. Yes.

"Q. They realized that?

"A. Yes.

"Q. You told them that with the view of influencing them from that angle, didn't you?

"A. I told them that with the idea of making them realize that I was a big creditor and that I had the first judgment, and that I thought they would get more out of a compromise settlement than if they permitted it to go to bankruptcy."

It appears from the testimony of A. A. Angelloz that there was no great difference in his understanding of the means to be used in getting a settlement with his other creditors than the understanding in this respect of Mr. Kurzweg, president of plaintiff company. We quote from Angelloz' testimony (tes. p. 71) as follows:

"Q. Explain the whole thing.

"A. We were going to get a creditors' meeting and we were going to wait until after Mr. Kurzweg had his judgment to get a creditors' meeting, and then we were to effect a compromise.

"Q. Who was to handle the thing for you?

"A. Mr. Kurzweg.

"Q. Did anything come up about this letter of guaranty?

"A. Yes. He asked me for a letter of guaranty from my brothers. I told him they would be willing to help me stay in business.

"Q. What was his proposition with reference to the letter of guaranty? What did he tell you about the letter of guaranty?

"A. He told me that I could stay in business, that if we could effect a compromise with the creditors, I could stay in business, and in six months we could pay it out."

The creditors' meeting was held on October 3, 1931, which Mr. Kurzweg attended and endeavored to induce the creditors to accept the 25 per cent. settlement. In order to persuade these creditors to accept the compromise settlement, he used the size of plaintiff's claim and the judgment thereon. No mention was made by him to the other creditors that his company was not to accept the 25 per cent. settlement on its claim. The creditors were not informed of the understanding had with A. A. Angelloz that he was to pay all of plaintiff's claim, and failing to do so, that his brothers had bound themselves to pay the balance.

The arrangement for securing the guaranty from defendants to cover the balance due on plaintiff's claim after six months grew out of the proposal to secure a compromise settlement with the other creditors of A. A. Angelloz. From the testimony of plaintiff's president, the letter of guaranty arose out of the plan to get this settlement, and, indeed, was suggested by plaintiff's president himself. Therefore, the motive, purpose, and consideration for signing this letter of guaranty by defendants had as a primary and eventual result the preferring of plaintiff company in the settlement over the other unsecured creditors without their knowledge.

If plaintiff is permitted to recover on this guaranty, it will have the effect of giving sanction and approval to a contract having as its purpose the giving of an undue preference to one creditor over others in a proposed composition which was supposed to be based on equality with all the creditors. Such a result is reprobated by law as being contrary to public policy and good morals. It is immaterial that the other creditors would suffer no injury in this particular case, nor does it matter that no direct fraud was intended by the parties to the arrangement. In such a case the obligation incurred by both the original debtor and that of his sureties in furtherance of such a result is stricken with nullity, and the courts will not lend their aid in its enforcement. On this point we quote the following from Corpus Juris, vol. 12, p. 289, paragraph 89:

"Authorities are not wanting in support of the doctrine that a promissory note, or a bond, guaranty, or other obligation, such as a check, a mortgage, or a judgment

914

note, given to a creditor by the debtor or by a third person on his behalf, with the object of securing to the recipient a secret advantage over other creditors, is void, both at law and in equity, in the hands of the payee or of one who is not a bona fide holder for value, and cannot be enforced' by either if the transaction was not known to the other creditors; and a court of equity, in a proper proceeding, will order such a security, unless held by a bona fide purchaser for value, to be set aside, canceled, or delivered up to the maker, or will enjoin the holder, unless a bona fide purchaser for value from proceeding thereon."

Among the authorities cited in support of the above statement of the law is the case of John T. Hardie's Sons & Co. v. Scheen et al., 110 La. 612, 34 So. 707. This case presented a situation similar to the present case, with only two exceptions not material to the present case. In that case Hardie's Sons & Co. had taken notes to secure the balance of its account from the debtor after assisting him in making a settlement with his creditors on the basis of 33⅓ per cent. and by leading the creditors to believe that this company was accepting the settlement, whereas the company, by previous arrangement with the debtor, secured two notes from the debtor to cover the balance. The plaintiff was denied a recovery on these notes. The reason assigned for denying plaintiff's claim on the notes is succinctly expressed in the syllabus of the case as follows:

"Courts will not lend their aid for the enforcement of contracts against good morals or against public policy; and a contract by which one creditor of an embarrassed debtor, in order to lure the other creditors to settle their claims at a reduced figure, outwardly agrees to the same reduction, while secretly exacting full payment, is of that character; and notes

in pursuance of it cannot be enforced, though given after the other creditors had been settled with on the reduced basis."

It is immaterial that the suit in that case was brought against the principal debtor while in this case the suit is against the guarantors. If the suit could not be maintained against the principal debtor on the principal debt, a fortiori, it could not be maintained against the sureties of that debt, for if the principal debtor was not liable, neither would his sureties be liable. And, as was said in the cited case, the fact that all or some of the creditors did not agree to the compromise would not change the legal situation. The same result would have been accomplished in obtaining this guaranty under the circumstances disclosed by the record had the creditors accepted the offer, i. e., plaintiff would have secured the same preference over the other creditors.

In the recent case of Baudoin v. Girouard, 164 So. 430, this court held that a note, given by the son of the principal debtor as a preference and to induce a creditor to accept a composition, without the knowledge of the other creditors, was unenforceable against the son, a third party, as being against good morals and contrary to public policy. The decision in that case, together with the authorities herein cited, is decisive of the present case. See, also, Weaver v. Waterman, 18 La.Ann. 241; Slidell v. Pritchard et al., 5 Rob. 101.

The conclusion reached on this phase of the case renders it unnecessary to discuss the other issues raised by the pleadings and the evidence, some of which present serious questions.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment of the district court be avoided, annulled, and reversed, and plaintiff's suit dismissed at its cost in both courts.